James STRAWN and James Staton, in-dividually and on behalf of all others similarly situated, Plaintiffs,

v.

AT & T MOBILITY, INC., f/k/a Cingular Wireless LLC [1], Defendant.

Civil Action No. 2:06–0988.

United States District Court, S.D. West Virginia, at Charleston.

Sept. 26, 2007.

---

1. Defendant indicates that "[o]n January 8, 2007, the name of Cingular Wireless LLC was changed to AT & T Mobility LLC." (Surreply at 1 n. 1). For the purposes of clarity in this memorandum opinion and order, the court will refer to the defendant as "Cingular." Nevertheless, the Clerk is directed to amend the style of this case in accordance with the caption above.

Harry F. Bell, Jr., Tim J. Yianne, William L. Bands, Bell & Bands, Charleston, WV, for Plaintiffs.

Evan M. Tager, Jack L. Wilson, Mayer Brown Rowe & Maw, Jennifer N. Waters, Lynn E. Parseghian, Crowell & Moring, Washington, DC, Jeffrey M. Wakefield, Flaherty Sensabaugh & Bonasso, Charleston, WV, Seamus C. Duffy, William M. Connolly, William M. McSwain, Drinker Biddle & Reath, Philadelphia, PA, for Defendant.

*MEMORANDUM OPINION*
*AND ORDER*

JOHN T. COPENHAVER, JR., District Judge.

Pending is a motion to remand filed by plaintiffs on December 1, 2006.

### I.

According to the class action complaint, defendant AT & T Mobility, Inc. f/k/a Cingular Wireless LLC ("Cingular") imposed a $2.99 monthly charge for a "roadside assistance" service plan which plaintiffs never requested. (Compl. ¶¶ 1, 5). The customer had to identify the charge and affirmatively opt out in order not to be billed the $2.99 monthly fee. (*Id.* ¶ 5). The benefits of the roadside assistance plan "include towing service, ... [dead] battery service, flat tire assistance, fuel delivery service, lockout assistance, and key replacement." (*Id.* ¶ 4).

On September 12, 2006, the plaintiffs filed this class action in Kanawha County Circuit Court alleging the unauthorized $2.99 monthly fee violated the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va.Code § 46A–1–101, *et seq.* (Compl.¶¶ 40–45). The complaint alleges a single cause of action which more specifically contends that the unauthorized $2.99 fee was an unfair or deceptive act or practice in violation of W. Va.Code § 46A–6–104, as defined by W. Va.Code §§ 46A–6–102(7)(L) and (M). (*Id.* at ¶¶ 43, 45). On November 21, 2006, defendant removed the action based on jurisdiction conferred by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). (Not. of Rem. ¶¶ 4, 10–12). Plaintiffs respond that federal jurisdiction is lacking because the amount in controversy does not exceed $5,000,000. (Mot. to Rem. at 2).

### II.

#### A. CAFA

CAFA's key provision is its sweeping amendment of the federal diversity jurisdiction statute, 28 U.S.C. § 1332. The amendment to 28 U.S.C. §§ 1332(d)(2), (d)(5) provides:

(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

. . .

(5) Paragraphs (2) through (4) shall not apply to any class action in which—

(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

And so, the four CAFA prerequisites giving federal courts original jurisdiction in class actions consist of: (1) the aggregate amount in controversy must exceed $5,000,000; (2) any member of the plaintiff class must be a citizen of a state different from any defendant ("minimal diversity"); (3) the primary defendants must not be states, state officials, or other government entities against whom the district court

may be foreclosed from ordering relief; and (4) the number of the plaintiff class must be 100 or more.

Both plaintiffs and defendant agree minimal diversity is present inasmuch as plaintiffs are West Virginia citizens and defendant is incorporated in Delaware with its principal place of business in Georgia. (Mot. to Rem. at 1; Compl. ¶ 9; Not. of Rem. ¶ 3). Cingular is clearly not a state, state official, or government entity. Plaintiffs do not dispute that the putative class would be substantially larger than 100. (Mot. to Rem. at 1–2). Plaintiffs challenge only the amount-in-controversy requirement. (*Id.* at 1).

## B. Plaintiffs' Attempts to Limit Amount in Controversy

### 1. Stipulations of Putative Class Representatives and Counsel

■ The plain language of the stipulations of both putative class representatives Strawn and Staton simply do nothing to limit the aggregate amount in controversy to $5,000,000 or less. (Strawn Stipulation on Limitation of Damages, attached as Ex. A to Compl.; Staton Stipulation on Limitation of Damages, attached as Ex. B to Compl.). They merely make statements about their individual damages such as "I will not accept an award exceeding $75,000.00 ..." (Strawn Stipulation on Limitation of Damages ¶ 3, attached as Ex. A to Compl.; Staton Stipulation on Limitation of Damages ¶ 3, attached as Ex. B to Compl.). They do not purport to limit recovery of the other putative class members. (*Id.*).

The stipulation of plaintiffs' counsel states, in relevant part, the following: "Bell & Bands, PLLC will not accept an aggregate award for attorney fees and costs exceeding $5,000,000, inclusive of any other damages awarded to each named Plaintiff and Class member." (Bell Stipulation ¶ 5, attached as Ex. C to Compl.).

Although courts have recognized binding stipulations under certain circumstances can amount to an agreement not to seek damages equal to or in excess of the jurisdictional amount, *De Aguilar v. Boeing Company*, 47 F.3d 1404, 1412 (5th Cir. 1995); *McCoy v. Erie Ins. Co.*, 147 F.Supp.2d 481, 485–486 (S.D.W.Va.2001); *Hicks v. Herbert*, 122 F.Supp.2d 699, 701 (S.D.W.Va.2000), the stipulations in this case do not rise to that level.

### 2. The Complaint

■ Paragraph 17 of the complaint states "[t]he aggregate damages for all purposes, exclusive of interest and costs, do not exceed $5,000,000 in this action." In the *ad damnum* clause the following relief is requested:

4. That this Court award Plaintiffs and all Class members damages of which the individual recoveries do not exceed $75,000 for Plaintiffs or any member of the Class, inclusive of interest and attorneys' fees and all relief of any nature sought herein;

. . .

6. That this Court award Plaintiffs and all Class members all attorney fees and costs incurred in the prosecution of this action, not to exceed $75,000 for each named Plaintiff and Class member, inclusive of any other damages awarded to each named Plaintiff and Class member.

(Wherefore Cl. ¶¶ 4, 6).

The United States Supreme Court, in *dicta*, has stated that a plaintiff can "resort to the expedient of suing for less than the jurisdictional amount, and though he would be justly entitled to more, the defendant cannot remove." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 294, 58 S.Ct. 586, 82 L.Ed. 845 (1938). "Many courts have seized on the ... *Red Cab dicta* as a bright-line rule compelling

remand where a specific sum less than the jurisdictional amount is stated." *McCoy,* 147 F.Supp.2d at 484. The statement in *Red Cab* was premised on the notion that plaintiffs would be bound by the amount alleged in the *ad damnum* clause of the complaint. *See De Aguilar,* 47 F.3d at 1410.[2]

No fewer than four West Virginia district court cases have held that the ability of plaintiffs in West Virginia to retract any restriction on damages made in a complaint requires West Virginia courts to depart from the general rule set forth in *Red Cab. Asbury–Casto v. GlaxoSmithKline, Inc.,* 352 F.Supp.2d 729, 733 (N.D.W.Va. 2005); *Virden v. Altria Group, Inc.* 304 F.Supp.2d 832, 847 (N.D.W.Va.2004) ("In general, courts treat the amount requested by the plaintiff in the state court as the amount in controversy. 14C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3725 (3d ed.1998). This rule can be problematic, however, in states, such as West Virginia, where recovery in the courtroom is not limited to the amount demanded in the complaint."); *McCoy,* 147 F.Supp.2d at 484–485 ("Many state court systems, including West Virginia, have interpreted their civil rules amendments in a way that encourages an adroit plaintiff to deny a diverse defendant access to the federal forum and yet, later, expose that defendant to a damage award that would have supported exercise of federal jurisdiction."); *Hicks,* 122 F.Supp.2d at 701.

The Supreme Court of Appeals of West Virginia explained that under Rules 15(b) and 54 of the West Virginia Rules of Civil Procedure it is "not the amount stated in the *ad damnum* clause but the actual proof of the plaintiff's damages which will control the issue." *Berry v. Nationwide Mut. Fire Ins. Co.,* 181 W.Va. 168, 177, 381

S.E.2d 367, 376 (1989). In West Virginia, the propriety of the verdict is tested by the evidence to support the recovery and not by the amount of the *ad damnum* clause. *Id.*

The cases cited by plaintiffs in support of their position that limitations in *ad damnum* clauses preclude removal are not helpful inasmuch as all those cases are from jurisdictions outside West Virginia. For example, in *Chavis v. Fidelity Warranty Services, Inc.,* 415 F.Supp.2d 620, 627 (D.S.C.2006), the federal district court used the general rule from *Red Cab* regarding the plaintiff's ability to choose to seek less than the amount-in-controversy to avoid federal jurisdiction. However, that case was applying South Carolina law where, unlike West Virginia,

[p]laintiffs could have limited the damages alleged in their complaint to escape possible removal to federal court under CAFA. *See* S.C. R. of Civ. P. 8(a)(3) (allowing a party to plead the total amount in controversy and limit the claim "for all purposes").

*Id.* Similarly, plaintiffs cite to the unpublished opinion in *Morgan v. Gay,* 2006 WL 2265302, *4 (D.N.J.2006) where the court was "convinced, to a legal certainty, that the recovery Plaintiff potentially will receive will not exceed $5 million as Plaintiff has capped her potential recovery to that amount [in her complaint]." This same assurance is not present in the West Virginia court system.

In short, an *ad damnum* clause that seeks an amount below the jurisdictional threshold is not, in and of itself, enough here to deny federal jurisdiction. *McCoy,* 147 F.Supp.2d at 484–486.

---

**2.** An unpublished opinion in our court of appeals highlighted this point. *See Aikens v.*

*Microsoft Corp.,* 159 Fed.Appx. 471, 475–476 (4th Cir.2005).

## III.

### A. Burden of Persuasion

■ The analysis begins with recognition of the long-settled proposition, espoused repeatedly by our court of appeals, that the proponent of federal jurisdiction bears the burden of demonstrating the legitimacy of its exercise. *Lontz v. Tharp,* 413 F.3d 435, 439 (4th Cir.2005); *Maryland Stadium Auth. v. Ellerbe Becket Inc.,* 407 F.3d 255, 260 (4th Cir.2005); *Dixon v. Coburg Dairy, Inc.,* 369 F.3d 811, 816 (4th Cir.2004); *Sonoco Prods. Co. v. Physicians Health Plan, Inc.,* 338 F.3d 366, 370 (4th Cir.2003); *Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148, 151 (4th Cir.1994). Soon after the passage of CAFA, some district courts held that CAFA's legislative history shifted the entire burden to the plaintiff to prove federal jurisdiction did not exist, *see, e.g., Harvey v. Blockbuster, Inc.,* 384 F.Supp.2d 749, 752 (D.N.J.2005), but this argument has been rejected by all four courts of appeals to consider the issue. *Morgan v. Gay,* 471 F.3d 469, 473 (3d Cir.2006); *Abrego Abrego v. The Dow Chem. Co.,* 443 F.3d 676, 685–686 (9th Cir.2006) (per curiam); *Miedema v. Maytag Corp.,* 450 F.3d 1322, 1329–30 (11th Cir.2006); *Brill v. Countrywide Home Loans, Inc.,* 427 F.3d 446, 448 (7th Cir.2005).

■ The court concludes that the removing defendant bears the burden of establishing the initial CAFA predicates necessary to invoke federal jurisdiction, including the $5,000,000 amount-in-controversy threshold. *Id.*

### B. Evidentiary Standard

■ At the outset, the court notes that removal statutes must be construed in light of the federalism concerns that animate the policy of strictly confining federal jurisdiction within the congressionally-set limits. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108–109, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). "The policy of the statute calls for its strict construction." *Healy v. Ratta,* 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934). A case must be remanded if federal jurisdiction is doubtful. *Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148, 151 (4th Cir. 1994); *see also Able v. Upjohn Co.,* 829 F.2d 1330, 1332 (4th Cir.1987), *cert. denied,* 485 U.S. 963, 108 S.Ct. 1229, 99 L.Ed.2d 429 (1988) (stating that "congressional desire to restrict removal has been understood to require that doubts about the propriety of removal be resolved in favor of retained state court jurisdiction").

■ In a case that is filed initially in federal court, a district court has original jurisdiction if the requisite diversity of citizenship exists unless it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938). However, the "legal certainty" test applies only in instances in which a plaintiff invokes federal jurisdiction by filing a case in federal court. *Landmark Corp. v. Apogee Coal Co.,* 945 F.Supp. 932, 935 (S.D.W.Va.1996). A different test applies "in removal situations ... in which the plaintiff has made an unspecified demand for damages in state court." *Id.* A defendant who removes a case from state court in which the damages sought are unspecified, asserting the existence of federal diversity jurisdiction, must prove by a preponderance of the evidence that the value of the matter in controversy exceeds the jurisdictional amount. *Id.; Tapscott v. MS Dealer Serv. Corp.,* 77 F.3d 1353, 1357 (11th Cir.1996); *De Aguilar v. Boeing Co.,* 11 F.3d 55, 58 (5th Cir.1993) and *De Aguilar v. Boeing Co.,* 47 F.3d 1404 (5th Cir. 1995), *cert. denied,* 516 U.S. 865, 116 S.Ct. 180, 133 L.Ed.2d 119 (1995); *Gafford v. General Elec. Co.,* 997 F.2d 150, 158 (6th

Cir.1993); *Gaus v. Miles, Inc.*, 980 F.2d 564, 567 (9th Cir.1992).

■ In this case, however, the plaintiffs' damages are not completely unspecified. Rather, at one point plaintiffs allege that "[t]he aggregate damages for all purposes, exclusive of interest and costs, do not exceed $5,000,000 in this action." (Compl.¶ 17). Although courts are split as to which standard applies to this situation,[3] this court has used the preponderance of the evidence standard in removal cases involving amount-in-controversy questions since the 1996 decision in *Landmark Corp. See Landmark Corp.*, 945 F.Supp. at 935; *Sayre v. Potts*, 32 F.Supp.2d 881, 886 (S.D.W.Va.1999); *McCoy*, 147 F.Supp.2d at 489. To satisfy this burden, as emphasized in *Sayre*, a defendant must offer more than a bare allegation that the amount in controversy exceeds a given amount. *See Gaus*, 980 F.2d at 567 (stating that allegation without supporting facts will not satisfy burden of establishing amount in controversy). Rather, the defendant seeking removal must supply evidence to support his claim regarding the jurisdictional amount at issue. *Sayre*, 32 F.Supp.2d at 886.

## C. Breakdown of Potential Damages

■ In addressing the propriety of federal jurisdiction in a removal action, the court must base its decision on the record existing at the time the petition for removal was filed. *Red Cab*, 303 U.S. at 291, 58 S.Ct. 586. In calculating that amount, the court may consider the " 'entire record before it and make an independent evaluation' " of whether the amount in controversy is satisfied. *Sayre*, 32 F.Supp.2d at 886. "In this circuit, it is settled that the test for determining the amount in controversy in a diversity proceeding is 'the pe-

cuniary result to either party which [a] judgment would produce.' " *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir.2002) (citing *Gov't Employees Ins. Co. v. Lally*, 327 F.2d 568, 569 (4th Cir.1964)).

### 1. Compensatory Damages

■ The WVCCPA provides that consumers who have suffered an ascertainable loss of money or property as a result of an act or practice prohibited by article six may be entitled to recover actual damages or $200, whichever is the greater amount. W. Va.Code § 46A–6–106(a). In their complaint, plaintiffs allege defendants have violated article six, and only article six, of the WVCCPA. (Compl. ¶¶ 41–45). Each member of the class could conceivably receive a $200 statutory remedy. Determining the potential class size is thus of paramount importance inasmuch as a class size of only 25,001 multiplied by the maximum $200 in statutory damages yields an amount just beyond the $5,000,000 amount-in-controversy threshold.

The class sought to be certified by plaintiffs' counsel includes all Cingular customers in West Virginia who were charged the $2.99 fee "without ever requesting or enrolling for said service," excluding any potential member who is affiliated with Cingular such as an officer, a director, or an employee. (Compl.¶ 20).

With the first of three supporting declarations from Eric Glymph, Cingular's director of business operations for Virginia and West Virginia, defendant originally contended that

Cingular's Roadside Assistance program was first made available to Cingular's customers in West Virginia in November 2004. From November 2004 through September 2006, more than 62,000 Cin-

---

**3.** *See, e.g., Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir.1994) (adopting legal certainty standard); *De Aguilar v. Boeing Co.*,

47 F.3d 1404 (5th Cir.1995), *cert. denied* 516 U.S. 865, 116 S.Ct. 180, 133 L.Ed.2d 119 (1995) (adopting preponderance standard).

gular customers in West Virginia have remained enrolled in the Roadside Assistance program beyond the initial free trial period and thus have paid Cingular's $2.99 per month charge for the Roadside Assistance program.

(1st Glymph Decl. ¶ 5, attached as Ex. B to Not. of Rem.).

In its memorandum in support of remand, plaintiffs posed the following questions: "Does the 62,000 Class size estimation include business accounts, and if so, how many? Does the 62,000 Class size estimation include employees of Cingular?" (Memo. in Supp. of Mot. to Rem. at 2 n. 1).

In response, Glymph's second declaration stated that "approximately five percent (5%) of Cingular's West Virginia subscribers are business customers" and there are "less than 100 [Cingular] employees in West Virginia." (2nd Glymph Decl. ¶¶ 5–6, attached as Ex. to Memo. in Opp. to Mot. to Rem.). The number of approximate business customers, 3,100 (5% of 62,000), along with the maximum number of Cingular employees in West Virginia, 100, may be subtracted from the original estimate of 62,000. Based upon these sworn representations by Cingular's director, the number of people billed the $2.99 fee, excluding business customers and Cingular employees, stands at approximately 58,800.

In their reply brief, plaintiffs again challenge the 58,800 figure proffered by the defendant by positing a question about the number of those who requested the roadside service. (Reply at 2). According to the complaint, the putative class sought by plaintiffs would consist of those Cingular West Virginia accounts in which the consumer was "*charged* a $2.99 monthly charge for the Roadside Assistance service *without* ever *requesting or enrolling for said service.*" (Compl. ¶ 20) (emphasis added).

The 58,800 figure as deduced from Glymph's first two declarations does not align with plaintiff's proposed class definition. Defendant's 58,800 figure was based on those who "have *remained enrolled* in the Roadside Assistance program beyond the initial free trial period *and thus have paid* Cingular's $2.99 per month charge ...." (1st Glymph Decl. ¶ 5, attached as Ex. B to Not. of Rem.) (emphasis added). Plaintiffs point out that Cingular's conception of the class, embodied in the Glymph declarations, does not explain how many of the 58,800 eligible consumers who paid the fee did so unwillingly. (Reply at 2). Those Cingular customers who requested the roadside assistance service could not be a member of the class, and plaintiffs are correct that defendant has not offered proof as to how many of those are part of the 58,800 figure. Plaintiffs' putative class definition is based on those consumers "charged ... without ... enrolling," whereas the 58,800 figure deduced from the Glymph declarations provided by the defendant is based on those who "remain enrolled." (Compl. ¶ 20; 1st Glymph Decl. ¶ 5, attached to Not. of Rem.). Plaintiffs' putative class is obviously much narrower.

The intent of the plaintiffs to limit the putative class to those incurring the fee without authorization is reiterated throughout the complaint. For example, paragraph 5 states:

Plaintiffs and Class members were not given an option. Instead, the Roadside Assistance was part of a "bundled" transaction, whereby the Plaintiff [sic] and Class members had to catch the Roadside Assistance charge, and opt-out of it. Otherwise, if Plaintiff and Class members failed to catch the charge, Cingular automatically enrolled them for the Roadside Assistance service and imposed a $2.99 monthly charge.

(Compl. ¶ 5). The complaint's description of the class representatives further underscores the point.

34. In or about May 2006, Plaintiff Strawn discovered that he was being assessed a $2.99 monthly charge for the Roadside Assistance service.

35. Upon information and belief, Plaintiff Strawn never requested or enrolled for the service.

36. As a result, Plaintiff Strawn has been wrongfully charged for a service that he never requested or enrolled for.

37. In or about May 2006, Plaintiff Staton discovered that he was being assessed a $2.99 monthly charge for the Roadside Assistance service.

38. Upon information and belief, Plaintiff Staton never requested or enrolled for the service.

39. As a result, Plaintiff Staton has been wrongfully charged for a service that he never requested or enrolled for.

(*Id.* ¶¶ 34–39).

The distinction between the putative class described in the complaint and the 58,800 figure deduced from the Glymph declarations is critical to the analysis of the amount in controversy. Yet, Cingular admits that it has no way of knowing whether the fee was authorized. The third Glymph declaration provides:

3. AT & T Mobility customers learn about the Roadside Assistance Program through various written and/or oral communications with AT & T Mobility, which include interactions such as (a) conversations with sales personnel at the time a customer initially signs up for Cingular's service, (b) written brochures and mailing which explain Roadside Assistance, (c) conversations with customer service representatives, and/or (d) the customer's bills, which identify Roadside Assistance as a separate charge.

4. Through these communications, customers receive information regarding the nature of the Roadside Assistance program, the services provided, the nature and extent of the trial period, and the nature and extent of the monthly charges once the trial period has expired. Accordingly, *AT & T Mobility distinguishes only between customers who are or are not enrolled in Roadside Assistance, and cannot track a hypothetical subset of Roadside Assistance customers who are being charged for Roadside Assistance but allegedly do not want it.*

(3rd Glymph Decl. ¶¶ 3–4, attached as Ex. to Surreply) (emphasis added). In three of the four ways a consumer could learn about the roadside assistance program, the resulting fee would be authorized and thus excluded from the class definition. Thus, there may be a significant portion of the 58,800 who requested the roadside assistance service.

Plaintiffs raised, for the first time in their reply, the deficiency of the 58,800 statistic insofar as Cingular fails to specify (or for that matter even estimate) the number within that figure who authorized the service. Consequently, the court provided Cingular an opportunity to respond. On February 21, 2007, the court ordered Cingular to "narrow its response to the more limited scope of the putative class and calculate the amount defendant believes to be in dispute" in a surreply. (02–21–07 Order at 2–3).

Cingular's surreply did not calculate such an amount and stated that the "Court's concerns cannot be resolved at the removal stage." (Surreply at 2). Instead, the surreply argues (1) that the

complaint may be read to include all West Virginia Roadside Assistance Customers as potential class members, (2) requiring Cingular to determine who suffered unauthorized charges would be an unwarranted burden at this stage of the case, and (3) remand here would frustrate the purpose behind CAFA. (*Id.* at 3–9). None of the three is availing.

As explained above, the first argument in the surreply fails because the class alleged in the complaint includes only those consumers who were charged a fee without their authorization. (Compl. ¶¶ 5, 20, 34–39). A group that includes all of the consumers charged the $2.99 fee extends beyond the scope of the class sought in the complaint.

With respect to the second argument in the surreply, defendant asserts that determining the amount of unauthorized charges would require the defendant to conduct individualized inquiries which may not be ordered at this stage of the litigation. (Surreply at 8). If the defendant has to conduct an individualized inquiry here, it is because of its own deficiencies in internal record keeping. Nothing in the defendant's argument changes the fact that the burden remains on the defendant to establish that the amount in controversy is satisfied. *Supra* at 604.

Defendant's third argument in the surreply is that "requiring defendants to make liability and damages determinations to avoid remand would be to make it nearly impossible for defendants to remove consumer class actions[,]" thereby frustrating the intent of CAFA. (Surreply at 9). However, CAFA clearly contemplates that the defendant must satisfy the court at the removal stage that the amount in controversy exceeds $5,000,000. That burden rests squarely on the defendant. The defendant here has failed to make the necessary evidentiary showing of the requisite jurisdictional amount.

### 2. Attorney Fees

After alleging an unfair or deceptive act or practice in violation of the WVCCPA, the complaint requests attorney fees and costs. (Compl. ¶¶ 40–46; Wherefore Cl. ¶ 6).

■ When attorney fees are provided for by contract or statute, the court may consider an award as part of the amount in controversy. *See Spielman v. Genzyme Corp.*, 251 F.3d 1, 7 (1st Cir.2001); *see also Manguno v. Prudential Property & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir.2002) ("[i]f a state statute provides for attorney's fees, such fees are included as part of the amount in controversy."); *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) ("[w]e hold that where an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy."); *cf. Saval v. BL Ltd.*, 710 F.2d 1027, 1033 (4th Cir.1983) (recognizing that courts have considered attorney fees as part of the jurisdictional amount where statutes or contractual provisions transform the fees into substantive rights to which litigants are entitled).

■ The parties offer little guidance as to the reasonable amount of attorney fees potentially available in this case and whether attorney fees are provided for by statute. Defendant does not make an argument regarding attorney fees. Its briefing focuses entirely on the size of the class in conjunction with the $200 statutory remedy in W.Va.Code § 46A–6–106.

Plaintiffs' materials are similarly unhelpful. Plaintiffs' counsel did file a stipulation, as previously noted, which provides:

1. Bell & Bands, LLC does not seek attorney fees and costs exceeding $75,000 for each named Plaintiff, inclusive of any other damages awarded to each named Plaintiff.

. . .

5. Bell & Bands, PLLC will not accept an aggregate award for attorney fees and costs exceeding $5,000,000, inclusive of any other damages awarded to each named Plaintiff and Class member.

(Bell Stipulation ¶¶ 1, 5, attached as Ex. C to Compl.). Paragraph 1 is clearly not a significant bar, and the ambiguous attempt to limit attorney fees in paragraph 5 could be read to limit only attorney fees and costs that counsel will accept as distinguished from the damages that may be awarded.

Plaintiff's entitlement to attorney fees, even if successful on the merits, is not guaranteed. Indeed, § 46A–6–106 has no express provision authorizing an award of attorney fees. Inasmuch as no express authorization exists under § 46A–6–106 for attorney fees, one court has held that a request for fees should not be included for purposes of determining the amount in controversy. *Virden v. Altria Group, Inc.*, 304 F.Supp.2d 832, 850 (N.D.W.Va.2004) ("Because the WVCCPA does not explicitly provide for attorney's fees, *see* W.Va. Code § 46A–6–106, the Court concludes that attorney's fees should be considered 'costs' and excluded from the calculation of the jurisdictional amount in controversy.").

### IV.

Keeping in mind that removal jurisdiction must be strictly construed, the court finds the defendant has not established by a preponderance of the evidence the amount-in-controversy requirement sufficient to trigger federal jurisdiction under CAFA's amendment to 28 U.S.C. § 1332(d). The defendant has not provided the number of putative class representatives despite being given a second chance to do so by the court so that an approximate number for compensatory damages may be calculated. Further, defendant has made no argument regarding the amount of attorney fees at stake and whether they are includible in the amount-in-controversy calculus.[4]

In sum, the court simply has no record to support a finding that the amount-in-controversy exceeds $5,000,000.

Based upon the foregoing, the motion to remand is granted.

The Clerk is directed to forward a copy of this memorandum opinion and order to all counsel of record.

---

4. It is noted that punitive damages are not sought in the complaint.